**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| DIANE CONNELLY, | : | CIVIL CASE NO. |
| Plaintiff, | : | 3: 20-CV-1060 (JCH) |
| | : | |
| | : | |
| v. | : | |
| | : | |
| MICHAEL KOMM, | : | OCTOBER 21, 2022 |
| HECTOR IRIZARRY, and | : | |
| TOWN OF FAIRFIELD, | : | |
| Defendants. | : | |

**RULING ON MOTION FOR SUMMARY JUDGMENT**
**(DOC. NO. 47)**

## I.    INTRODUCTION

Plaintiff, Diane Connelly ("Connelly"), brings this action against defendants,

Michael Komm ("Komm") and Hector Irizarry ("Irizarry"), under section 1983 of title 42 of

the United States Code ("section 1983") and Connecticut state law.  Connelly alleges

violations of her rights stemming from a 2017 arrest at a car dealership.

Now before the court is Komm and Irizarry's Motion for Summary Judgment

(Doc. No. 47), which Connelly opposes.  See Plaintiff's Objection to Defendants' Motion

for Summary Judgment ("Pl.'s Obj.") (Doc. No. 50).  For the reasons explained below,

Komm and Irizarry's Motion is granted.

## II.    BACKGROUND

### A.    Factual Background[1]

On July 19, 2017, Connelly went to Miller Nissan in an attempt to resolve a nine-month long dispute with the dealership.  See Plaintiff's Local Rule 56(a)2 Statement of Facts ("Pl.'s SOF") ¶ 1 (Doc. No. 50–2); Defendants' Local Rule 56(a)1 Statement of Facts ("Defs.' SOF") ¶ 1 (Doc. No. 47–2); Plaintiff's Exhibit 1, Deposition of Diane Connelly ("Connelly Dep.") at 37 (Doc. No. 50-3).  At the heart of the discord was a $14,000 charge-off on Connelly's daughter's credit report, which failed to account for a vehicle that the family returned when signing a new lease.  See Pl.'s SOF at 6;[2] Connelly Dep. at 14–15, 35–37.

Connelly does not know when exactly the two officers arrived at the dealership, see id. at 22; Defs.' SOF ¶ 3,[3] but Komm and Irizarry were a short distance away when they were dispatched to Miller Nissan about a reported disturbance and alleged trespassing.  See Pl.'s SOF ¶¶ 4–5; Defs.' SOF ¶¶ 4–5; Defendants' Exhibit B, Irizarry Affidavit ("Irizarry Aff.") ¶ 4 (Doc. No. 47-4); Defendants' Exhibit C, Komm Affidavit

---

[1] The court draws primarily from the parties' Local Rule 56(a) statements and supporting exhibits in summarizing the material facts.  As it must, the court construes all disputed facts in the light most favorable to Connelly, the non-moving party.  It does note where the parties disagree as to what happened.

[2] Despite the explicit instructions of the Local Rules, plaintiff's counsel neglected to "separately number[ ] paragraphs" in the "Additional Material Facts" section of the Local Rule 56(a)2 Statement.  See D. Conn. L. Civ. R. 56(a)(2)(ii).  As such, the court is forced to cite material found therein by page number rather than by paragraph.

[3] In her Local Rule 56(a)2 Statement, Connelly denies this.  Pl.'s SOF ¶ 3.  However, the plaintiff takes issue not with the veracity of the corresponding fact, but rather its pertinence.  Id. ("The relevant issue is not how long the defendants were on the scene at the time she first saw them.").  Such an objection is inappropriate as it plainly contravenes the purpose of the Local Rule.  Eiden v. McCarthy, 531 F. Supp. 2d 333, 339 (D. Conn. 2008) ("The purpose of the Rule 56 Statements is to help the court determine the facts of a case, whereas the parties' legal arguments are properly submitted in the memoranda of law.").

("Komm Aff.") ¶ 4 (Doc. No. 47-5).  The officers responded to the scene within two and three minutes respectively.  See Pl.'s SOF ¶¶ 4–5; Defs.' SOF ¶¶ 4–5.  According to the officers, they spoke with Miller when they arrived at the dealership.  See Defs.' SOF ¶ 7;[4] Irizarry Aff. ¶ 6; Komm Aff. ¶ 6.  Miller reported to the defendants that Connelly was inside the dealership "causing a disturbance, shouting at employees, throwing things[,] and had refused to leave when asked."  See Defs.' SOF ¶ 8;[5] Irizarry Aff. ¶ 7; Komm Aff. ¶ 7.

Both parties do not address the following, but Connelly testified that she was working with a sales manager to try to correct the credit issue.  See Pl.'s SOF at 7; Connelly Dep. at 15.  Connelly noticed Miller watching as she and the manager tried to solve the problem, see Pl.'s SOF at 7, when suddenly Miller "stormed [into the office] and said, [']Get out. You're trespassing.'"  Id.; Connelly Dep. at 15, 40.  Miller proceeded to grab Connelly's keys, knock over a cup of water, and throw her purse out of the manager's office and into the showroom.  Pl.'s SOF at 7.  Connelly was momentarily shocked but started walking towards the door within seconds of Miller's demand that she vacate the premises.  Id. at 7–8.  As she walked the length of the showroom to exit, she "tried to explain" herself to Miller and called her husband.  See id. at 8; Connelly

_____

[4] Connelly denies that this conversation took place prior to her arrest in her Local Rule 56(a)2 Statement.  Pl.'s SOF ¶ 7.  In support, Connelly cites to three sections of her deposition.  Id.  Those portions of the transcript, however, do not support the denial.  Therefore, the court deems this material fact admitted.  See D. Conn. L. Civ. R. 56(a)(2)(i)–(3); see also Eiden, 531 F. Supp. 2d at 338.

[5] Connelly's Local Rule 56(a)2 Statement denies that this information was conveyed on the scene rather than in the 911 call.  Pl.'s SOF ¶ 8.  To support the denial, Connelly cites the police report.  Id.; Plaintiff's Exhibit 2, Police Report (Doc. No. 50-4).  Review of the police report, however, offers support for the defendants' material fact as opposed to Connelly's denial.  See Police Report at 1 ("On arrival, Sgt. Irizarry and I met with Greg Miller in the parking lot.  Miller stated that customer Diane R. Connelly came into the dealership and caused a disturbance . . . [,] refusing to leave when asked.").  Accordingly, this material fact is deemed admitted.  See D. Conn. L. Civ. R. 56(a)(2)(i)–(3); see also Eiden, 531 F. Supp. 2d at 338.

Dep. at 39.  When Connelly reached her husband, she attempted to pass her phone to Miller but he "pushed her arm away. . . ."  Pl.'s SOF at 8.  By the time Connelly exited the dealership, Officers Komm and Irizarry were waiting for her at the door.  See id.; Connelly Dep. at 15–16, 40.

The officers handcuffed[6] her immediately, before briefly entering and exiting the dealership.  See Pl.'s SOF at 8; Connelly Dep. at 16, 42–43.  With Connelly in handcuffs, the officers walked her to their car.  See Pl.'s SOF at 9.  Each officer held onto an arm of the five-foot, approximately 100-pound plaintiff, even as she told them she could walk on her own.  See id.; Connelly Dep. at 13.  The parties agree that at one point—before reaching the officers' vehicle—Connelly tried to "shake" off Komm and Irizarry's firm grip on her arms.  See id. at 24; Defs.' SOF ¶ 9.[7]

The parties also agree that once inside the backseat, Connelly slipped one hand out of the handcuffs.  See id. at 28; Pl.'s SOF ¶ 10; Defs.' SOF ¶ 10.  Komm and Irizarry saw this happen and proceeded to reapply the handcuffs even more tightly.  See Pl.'s SOF ¶ 10; Defs.' SOF ¶ 10.  The handcuffs caused bruising on Connelly's wrists that lasted a couple of days, though she did not seek medical treatment for any physical injuries and has experienced no lasting physical effects.  See Connelly Dep. at 47.

---

[6] Throughout Connelly's deposition, she speaks of the restraint on her wrists interchangeably as handcuffs and as zip ties.  See Connelly Dep. at 23–26, 31, 43–44, 47–50, 53 (referring to the restraint as handcuffs); but see Connelly Dep. at 16, 27–28, 47 (noting the application of zip ties).  The police report as well as the affidavits of both officers speak only of standard metal handcuffs, so the court will refer to the restraint accordingly.  See Police Report at 3; Irizarry Aff. ¶ ¶ 11–12; Komm Aff. ¶ ¶ 11–12.

[7] Connelly denies this "as written" in her Local Rule 56(a)2 Statement.  Pl.'s SOF ¶ 9.  However, the section of her deposition transcript that Connelly points to in her denial explicitly mentions a "shake of the arm" to get their grip off.  Connelly Dep. at 24.  Accordingly, this material fact is deemed admitted. See Eiden, 531 F. Supp. 2d at 338.

At the police station, Connelly "calm[ed] down" and was released on a written promise to appear.  See id. at 17, 64.  The day after the arrest, Irizarry received an email from Miller thanking the officers for their "service and customer loyalty."  See Pl.'s SOF at 10; Plaintiff's Exhibit 3, Email (Doc. No. 50-5).  Miller mentioned that, after speaking with Connelly's husband and "contemplating the whole bad series of events", he wanted "to make it go away. . . ."  See Email.  This email was appended to the official incident report, which continued to represent that Miller "wishes to have Diane Connelly's Criminal Trespass warning stand for any future incidents."  See Pl.'s SOF at 11; Police Report at 4.  The charges against Connelly—namely, Criminal Trespass in the First Degree and Interfering with a Police Officer, see id. at 1—were "nolled" and dismissed subject to Connelly's agreement not to return to Miller Nissan for thirteen months.  See Connelly Dep. at 58–59.

      B.    Procedural Background

Connelly filed her complaint against the defendants and the Town of Fairfield on July 27, 2020.  See Complaint ("Compl.") (Doc. No. 1).  On November 17, 2021, the court granted defendants' Motion to Dismiss Count Two against the Town of Fairfield.[8] See Ruling Re: Defendants' Motion to Dismiss (Doc. No. 42).  However, the Motion to Dismiss was denied as to Count One—alleging false arrest, malicious prosecution, and unreasonable force in violation of Connelly's Fourth and Fourteenth Amendment rights—and Counts Three through Five—alleging assault, battery, unlawful detention, and intentional infliction of emotional distress under Connecticut state law.  Id.

---

[8] Count Two was dismissed without prejudice, but no amended complaint was filed.  As such, the Town of Fairfield has been dismissed from this case.

The court now considers defendants' Motion for Summary Judgment as to the remaining four Counts.  See Mot. for Summ. J.; Memorandum of Law in Support of Motion for Summary Judgment ("Defs.' Mem.") (Doc. No. 47-1); Defendants' Reply to Plaintiff's Objection to Motion for Summary Judgment ("Defs.' Reply") (Doc. No. 53). Connelly opposes that Motion.  See Pl.'s Obj.; Plaintiff's Memorandum of Law in Support of Objection to Defendants' Motion for Summary Judgment ("Pl.'s Mem.") (Doc. No. 50-1).

## III.    LEGAL STANDARD

A motion for summary judgment may be granted only where the moving party can establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wright v. N.Y. State Dep't of Corr., 831 F.3d 64, 71-72 (2d Cir. 2016).  If the moving party satisfies this burden, the nonmoving party must set forth specific facts demonstrating that there is indeed "a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  A genuine issue exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Cross Commerce Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir. 2016).  Unsupported allegations do not create a material issue of fact and cannot overcome a properly supported motion for summary judgment.  See Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000).  In assessing the record to determine whether there are disputed issues of material fact, the trial court must "resolve all ambiguities and draw all inferences in favor of the party against whom summary

judgment is sought."  LaFond v. Gen. Physics Servs. Corp., 50 F.3d 165, 175 (2d Cir. 1995).

## IV.     DISCUSSION

### A.     Count One: Violation of Connelly's Rights Under Section 1983

Connelly asserts violations of her Fourth Amendment rights—pursuant to section 1983—arising out of alleged false arrest, malicious prosecution, and excessive force violations by the defendants.  The Fourth Amendment to the U.S. Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  Section 1983 establishes a federal cause of action for "deprivation of any rights, privileges, or immunities secured by the Constitution" committed by a "person . . . [acting] under color of any statute, ordinance, regulation, custom or usage, of any State."  42 U.S.C. § 1983. The court will address each of Connelly's claims, in turn, below.

#### 1.     False Arrest

The defendants move for summary judgment on the false arrest claim based on the existence of probable cause, which Connelly disputes.  See Defs.' Mem. at 4–10; Pl.'s Mem. at 11–18.

The Second Circuit has instructed that courts should "generally look[ ] to the law of the state in which the arrest occurred" to determine the elements of claims for false arrest, in violation of the Fourth Amendment, brought under section 1983.  See Davis v. Rodriguez, 364 F.3d 424, 433 (2d Cir. 2004).  "To prevail on a claim of false arrest" in Connecticut, "a plaintiff must show that (1) the defendant intentionally arrested [her,] or had [her] arrested; (2) the plaintiff was aware of the arrest; (3) there was no consent to the arrest; and (4) the arrest was not supported by probable cause."  Conroy v. Caron,

275 F. Supp. 3d 328, 348 (D. Conn. 2017) (quotations and citations omitted).

Accordingly, in Connecticut as well as in the context of corresponding federal civil rights

actions, "a false arrest claim cannot lie when the challenged arrest was supported by

probable cause."  Russo v. City of Bridgeport, 479 F.3d 196, 203–204 (2d Cir. 2007).

     "The probable cause standard under Connecticut law and federal law are

substantively identical, requiring a showing that 'officers have knowledge or reasonably

trustworthy information of facts and circumstances that are sufficient to warrant a

person of reasonable caution in the belief that the person to be arrested has committed

or is committing a crime.'"  Washington v. Napolitano, 29 F.4th 93, 104–05 (2d Cir.

2022) (citation omitted).  In the false arrest context, "[t]he probable cause inquiry is

based upon whether facts known by the arresting officer at the time of the arrest

objectively provided probable cause to arrest."  Washington v. Dewey, 433 F. Supp. 3d

334, 346 (D. Conn. 2020) (emphasis added) (quotations and citations omitted).  "[I]t is

well-established that a law enforcement official has probable cause to arrest if he

received his information from some person, normally the putative victim or eyewitness."

Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000) (citation omitted).

     The linchpin of the false arrest claim is whether there was probable cause to

believe that Connelly committed Criminal Trespass in the First Degree, C.G.S. § 53a–

107, at the time of her arrest.  See Jaegly v. Couch, 439 F.3d 149, 154 (2d Cir. 2006)

("[A] claim for false arrest turns only on whether probable cause existed to arrest a

defendant, and that it is not relevant whether probable cause existed with respect to

each individual charge. . . .").  Under the relevant portion of the statute, "[a] person is

guilty of criminal trespass in the first degree when: (1) Knowing that such person is not

licensed or privileged to do so, such person enters or remains in a building or any other premises after an order to leave or not to enter personally communicated to such person by the owner of the premises or other authorized person. . . ."  C.G.S. § 53a–107.  Based on the undisputed facts, prior to making an arrest the defendants ascertained directly from Miller that Connelly remained at Miller Nissan without privilege to do so and in disregard of orders to leave by the son of the business' owner.  See Defs.' SOF ¶ 8; Irizarry Aff. ¶ 7; Komm Aff. ¶ 7.  That Connelly was still physically inside the dealership when this information was conveyed further buttresses the officers' belief that she was committing an ongoing trespass.  Moreover, considering what the record suggests defendants knew at the time, they were not obligated to investigate further.  Jocks v. Tavernier, 316 F.3d 128, 136 (2d Cir. 2003) (emphasizing that arresting officers do not have a duty to "investigate exculpatory defenses offered by the person being arrested or to assess the credibility of unverified claims of justification before making an arrest.").

One of Connelly's counterarguments posits that the "entire basis for her arrest was the false claim by Miller, owner of the dealership, that the plaintiff was trespassing."  See Pl.'s Mem. at 11.  From there, the argument suggests that a fabrication from Miller undermines the defendants' determination of probable cause.  However, "[t]he veracity of citizen complaints who are the victims of the very crime they report to the police is assumed."  Miloslavsky v. AES Eng'g Soc., Inc., 808 F. Supp. 351, 355 (S.D.N.Y. 1992), aff'd, 993 F.2d 1534 (2d Cir. 1993), cert. denied, 510 U.S. 817 (1993); see also McKinney v. George, 726 F.2d 1183, 1187 (7th Cir. 1984) ("If policemen arrest a person on the basis of a private citizen's complaint that if true would justify the arrest, and they

reasonably believe it is true, they cannot be held liable for a violation of the Constitution merely because it later turns out that the complaint was unfounded.").  As such, no reasonable jury could find it was unreasonable for the defendants to assume Miller's report—as a complaint from the victim of the crime being reported—was truthful, especially considering their own observations corroborating his account.

Connelly also asserts that Miller's statement to the defendants was deficient because it was not offered in the form of a written, signed statement.  Pl.'s Mem. at 12.  For this proposition, Connelly cites a single case, Singer v. Fulton County Sheriff, where the Second Circuit noted that "[a]n arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity."  63 F.3d 110, 119 (2d Cir. 1995); Pl.'s Mem. at 12.  Her reliance on Singer is misplaced, though, as "the Second Circuit and other courts have found probable cause to exist where, in the absence of circumstances raising doubts as to the victim's veracity, the police received information directly from a purported victim of a crime without a formal written complaint."  Stokes v. City of New York, 2007 WL 1300983, at *5 (E.D.N.Y. May 3, 2007).  Indeed, the undisputed material facts offer no reason for the defendants to have doubted Miller's report, which was directly conveyed by a victim and supported by their own observations.

The undisputed material facts and record—including the 911 complaint, the conversation with Miller outside the dealership, and the officers' own observation of Connelly's continued presence inside the dealership in defiance of Miller's reported

demands that she leave—is such that no reasonable jury could find that the defendants lacked probable cause in arresting Connelly for trespass.

Thus, the defendants' Motion for Summary Judgement as to the false arrest claim in Count One is granted.

2.      Malicious Prosecution

As with the false arrest claims, the parties argue that Connelly's malicious prosecution claim hinges on the existence—or nonexistence—of probable cause.  See Defs.' Mem. at 13; Pl.'s Mem. at 18–21.  This is because an essential element for malicious prosecution, like false arrest, is the absence of probable cause.  Betts v. Shearman, 751 F.3d 78, 82 (2d Cir. 2014).

Success on a section 1983 claim for malicious prosecution requires a plaintiff to "show a violation of [her] rights under the Fourth Amendment and establish the elements of a malicious prosecution claim under state law."  Holman v. Cascio, 390 F. Supp. 2d 120, 122 (D. Conn. 2005).  "To prevail upon a malicious prosecution claim . . . a plaintiff must prove . . . (1) the defendants initiated or procured the institution of criminal proceedings against the plaintiff; (2) the criminal proceedings terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice. . . ."  Id. (emphasis omitted).

Despite the similarities between the probable cause standard in the false arrest and malicious prosecution contexts, there remain important differences.  "The probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases."  Stansbury v. Wertman, 721 F.3d 84, 95 (2d Cir. 2013).  "The determination of probable cause [also] . . . must be evaluated in light of the facts known or believed at the time the prosecution is initiated, rather than at the time of the arrest."

Deanda v. Hicks, 137 F. Supp. 3d 543, 574 (S.D.N.Y. 2015) (internal quotations and citations omitted); Richardson, 2022 WL 595935, at *10.

Even with the slightly higher standard for malicious prosecution, the probable cause analysis for the criminal trespass charge closely tracks the discussion in the false arrest context.  That is because the only information in the record that the defendants received following the arrest comes from Miller's email to Irizarry.  See Email.  In the message, Miller thanks the officers for their "fast response and handling of the problem", and asks if it would be possible to drop the charges against Connelly.  Id.  Miller's missive makes clear that his request is a byproduct of an hour-long conversation with Connelly's husband, where he learned "a lot more of the background story" and decided he'd rather "make it go away."  Id.  While the email concludes with a perplexing and ill-considered thank you for the defendants' "customer loyalty," there is nothing that alters or undermines the account that Miller relayed to Komm and Irizarry a day prior.

Moreover, in the malicious prosecution context, "an officer" generally "has no duty to investigate exculpatory defenses."  Cafasso v. Nappe, 2017 WL 4167746, at *7 (D. Conn. Sept. 20, 2017).[9]  Nor is there any evidence in the record upon which a reasonable jury could conclude that Miller "had a history of making false accusations that could be discovered with reasonable effort or . . . [had] made inconsistent statements" to the police, which some district courts have held could trigger a duty to

---

[9] The Second Circuit has articulated an exception to this general rule "in cases involving prolonged detentions."  Cafasso, 2017 WL 4167746, at *7.  That exception does not apply here, however, as it "had been narrowly construed to involve situations where a law enforcement official has mishandled or suppressed readily available exculpatory evidence, which resulted in the plaintiff's unreasonably long incarceration."  Id. (internal quotations and citations omitted).  To meet the requirements for this exception, "a plaintiff must show [her] claim of innocence is 'readily-verifiable.'"  Id.  That is not the case here.

investigate further.  McCaffrey v. City of New York, 2013 WL 494025, at *10 (S.D.N.Y. Feb. 7, 2013).  Thus, there is nothing in the record that alters the conclusion that no reasonable jury could find a lack of probable cause for the criminal trespass charge.

Next, there's the issue of probable cause for the charge of interfering with a police officer.  C.G.S. § 53a–167a.  The statute provides that "[a] person is guilty of interfering with an officer when such person obstructs, resists, hinders or endangers any peace officer . . . in the performance of such peace officer's . . . duties."  Id.  Connecticut courts are clear that this statute is broad in scope, and that it is apparent that "the legislature intended to prohibit any act which would amount to meddling in or hampering the activities of the police in the performance of their duties. . . ."  State v. Aloi, 280 Conn. 824, 833 (2007) (citations omitted).  "To avoid the risk of constitutional infirmity," the Connecticut Supreme Court has construed this capacious language "to proscribe only physical conduct and fighting words that by their very utterance inflict injury or tend to incite an immediate breach of the peace."  State v. Williams, 205 Conn. 456, 473 (1987) (citation and quotation omitted).

Connelly's description of the events after she was put in handcuffs largely tracks the defendants' version of events.  Both parties agree that Connelly tried to "shake" off Komm and Irizarry's firm grip on her arms while they were walking her to their squad car, see id. Connelly Dep. at 24; Defs.' SOF ¶ 9, and that once inside the backseat, Connelly "was able to" slip one hand out of the handcuffs.  See id. at 28; Pl.'s SOF ¶ 10; Defs.' SOF ¶ 10.  While a five-foot, approximately 100-pound woman's attempt to "shake" off the grip of two police officers is unlikely to amount to meddling in or hampering the performance of law enforcement duties alone, it provides additional

13

context for the officers' assessment of probable cause after Connelly slipped out of her handcuffs.  Moreover, convictions for interfering with an officer have turned on as little as "pull[ing] away during the handcuffing procedure. . . ."  State v. Calabrese, 116 Conn. App. 112, 125 (2009).  It is a close call as to whether there was probable cause for this charge, which would ordinarily be sufficient to defeat a motion for summary judgment on this claim.

Yet, Connelly's claim for malicious prosecution fails for a different reason: it does not meet the "favorable termination" element.  Indeed,

> [t]he majority of decisions applying Connecticut law . . . hold that a nolle of the criminal charge may still permit the plaintiff to satisfy that element if the circumstances of the nolle satisfy the See v. Gosselin test of "an abandonment of the prosecution without request from or by an arrangement with [the defendant]."

Holman, 390 F. Supp. 2d at 123 (quoting See v. Gosselin, 133 Conn. 158, 160 (1946).  The Gosselin test will bar a malicious prosecution claim where "the defendant received the nolle in exchange for providing something of benefit to the state or victim."  Id. at 124; Roberts v. Babkiewicz, 582 F.3d 418, 421 (2d Cir. 2009) (collecting malicious prosecution cases adjudicated at the summary judgement stage where the outcome turned on whether the nolle was conditioned upon a benefit to the state or victim); Conquistador v. Zweibelson, 2019 WL 4758350, at *3 (D. Conn. Sept. 30, 2019) (emphasizing that "the entry of a nolle prosequi will not constitute a favorable termination for purposes of a malicious prosecution" if the plaintiff received it in exchange for providing a benefit to the state).  According to Connelly, her charges were "nolled" and dismissed in exchange for her agreement not to go to Miller Nissan for 13 months.  Connelly Dep. at 58–59.  Such an agreement was clearly intended to avoid future incident, benefiting both the victim and the state.  Because there are no disputed

facts as to the nature of this condition, this claim fails and summary judgment is granted to the defendants.

        3.     Excessive Force

The defendants move for summary judgment on Connelly's claims of excessive force, arguing that they used reasonable force, caused minimal or no injury, and that they should be entitled to qualified immunity.  See Defs.' Mem. at 13–15.  Connelly opposes summary judgment by arguing that there's a genuine dispute of material fact as to whether the defendants' use of force—both in walking her to the squad car and applying handcuffs tightly—was reasonable.  See Pl.'s Mem. at 24.

To prevail on an excessive force claim against a police officer, the plaintiff must show that the amount of force used was objectively unreasonable as to either when or how the force was applied, and that, as a result of the use of force, she suffered some compensable injury.  See Graham v. Connor, 490 U.S. 386, 396 (1989) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, . . . violates the Fourth Amendment."); Maxwell v. City of New York, 380 F.3d 106, 108 (2d Cir. 2004).  Whether a given quantum of force is excessive depends on "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Graham, 490 U.S. at 396.  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight", and must allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense,

uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 396–97.

Connelly's first claim of excessive force arises from both defendants grabbing her firmly by the arm to escort her to their vehicle.  Sustaining such a claim requires Connelly to show that "that the alleged use of force is objectively sufficiently serious or harmful enough to be actionable and, consequently, that the amount of force used was more than de minim[i]s." Sharnick v. D'Archangelo, 935 F. Supp. 2d 436, 448 (D. Conn. 2013) (citation and quotations omitted).  Because an arrest necessarily accompanies "some degree of dominion, . . . one would expect officers to exert a minimum amount of force—such as grabbing an arrestee's arms—against any non-passive arrestee." Bauer v. City of Hartford, 2010 WL 4429697, at *11 (D. Conn. Oct. 29, 2010) (citations and quotations omitted).  While Connelly notes that the defendants grabbed her despite her cooperation, Connelly Dep. at 24, the admitted material facts include Miller's on-the-scene complaint that Connelly had been "throwing things and had refused to leave when asked", see Defs.' SOF ¶ 8; Irizarry Aff.  ¶ 7; Komm Aff. ¶ 7.  Further, while in handcuffs, Connelly could be injured if she tripped and was not supported.

Connelly also concedes that she did not suffer any injury to her arms as a result of the defendants' actions.  Id. at 31.  This is not dispositive, as the "case law focuses on whether the force used was de minimis, rather than whether the alleged injury was de minimis." Sharnick, 935 F. Supp. 2d at 448; see also Amato v. City of Saratoga Springs, 170 F.3d 311, 317 (2d Cir. 1999) ("[A] litigant is entitled to an award of nominal damages upon proof of a violation of a substantive constitutional right even in the absence of actual compensable injury.").  Still, the lack of any injury to her arm—which

is still a factor that bears on "whether the use of force could plausibly have been thought necessary" and "may also provide some indication of the amount of force applied", Barcomb v. Kraeger, 2016 WL 2644885, at *5 (D. Conn. May 5, 2016) (citations and quotations omitted)—is not the only support for the proposition that the use of force was de minimis.  Indeed, Connelly's own testimony was careful to clarify that the defendants were not "dragging" her, but rather were "holding" and "putting [her] towards the car." Connelly Dep. at 24.  As such, even when analyzed in a light most favorable to Connelly, the undisputed material facts are such that no reasonable jury could find that the defendants' use of force in "putting [her] towards the car" was unreasonable.

Connelly's second claim of excessive force arises out of the defendants' use of handcuffs during the arrest.  "It is well-established that the right to make an arrest accompanies with it the right to use some degree of physical coercion."  Barcomb, 2016 WL 2644885, at *5 (citations and quotations omitted).  A reasonable arrest generally involves the use of handcuffs, which "must be tight enough to prevent the arrestee's hands from slipping out."  Id. (citations and quotations omitted).  But, when presented with the opportunity, the Second Circuit has declined "to adopt a per se rule that the use of handcuffs in effecting an arrest is always reasonable."  Soares v. Connecticut, 8 F.3d 917, 921 (2d Cir. 1993).  Instead, the Second Circuit has held that "where an officer's use of force in handcuffing is plainly unreasonable under the circumstances or where a plaintiff manifests clear signs of her distress—verbally or otherwise—a fact finder may decide that the officer reasonably should have known that his use of force was excessive. . . ."  Cugini v. City of New York, 941 F.3d 604, 613 (2d Cir. 2019) (emphasis omitted).

17

Taking all the evidence on the record before the court in the light most favorable to Connelly, as the court must at this stage, no reasonable jury could find the defendants' actions unreasonable.  To begin with, Connelly testified that the handcuffs hurt her wrists when initially applied, and that she believes she conveyed that fact to the defendants.  Connelly Dep. at 25.  Despite this, Connelly added that the handcuffs were loose enough that she "was able to" get one of them "to come off" in the backseat of the squad car.  Id. at 26.  Thus, the fact that the defendants reapplied the handcuffs even more tightly than they did initially was a reasonable response to Connelly managing to slip her hand out.  Cf. Esmont v. City of New York, 371 F. Supp. 2d 202, 214 (E.D.N.Y. 2005) ("Frequently, a reasonable arrest involves handcuffing the suspect, and to be effective handcuffs must be tight enough to prevent the arrestee's hands from slipping out.").

Additionally, accepting that the reapplied handcuffs caused the week-long bruising, Connelly's claim of excessive force is also undermined by the degree of injury suffered.  Besides the fact that Connelly admitted that slipping off the handcuff caused irritation, id. at 28, her uncontradicted testimony affirms that she never sought medical attention for her physical injury and that she suffered no residual or lasting pain, id. at 47.  As courts in this District have acknowledged, such facts are relevant in evaluating an excessive force claim arising from the application of handcuffs.  See Witt v. Armstrong, 2022 WL 3043546, at *7 (D. Conn. Aug. 2, 2022) ("Nor does Plaintiff claim she suffered any long-term injuries, or any injury at all other than soreness and slight bruising which resolved completely in less than two weeks.  Such facts do not establish excessive force due to unreasonably tight handcuffs."); Ferraresso v. Town of Granby,

646 F. Supp. 2d 296, 307–08 (D. Conn. 2009) ("[Plaintiff] never sought medical attention for his wrists at any time after the incident.  [Plaintiff] has not shown that he suffered a compensable injury to his wrists as a result of the handcuffing.").  It is true that the degree of injury is not dispositive—courts in this District have also denied summary judgment in cases involving week-long bruises and scrapes, see, e.g., Barcomb, 2016 WL 2644885, at *2, 6—but the undisputed material facts in this case are such that no reasonable jury could find that the defendants' application of handcuffs was unreasonable under these narrow circumstances.

Therefore, the court grants the defendants' Motion for Summary Judgment as to Count One of the Complaint.[10]

B.      Remaining State Law Claims: Count Three Through Five

Having dismissed all of Connelly's federal law claims, the court declines to exercise supplemental jurisdiction over Connelly's state law claims against Komm and Irizarry for assault, battery, unlawful detention, and intentional infliction of emotional distress.  See Compl.

A district court has supplemental jurisdiction over state law claims "that are so related to claims in the action within such original jurisdiction" that they amount to the same constitutional case or controversy.  28 U.S.C. § 1367(a).  However, a district court "may decline to exercise supplemental jurisdiction" after the court has "dismissed all claims over which it has original jurisdiction."  Id. at § 1367(c)(3).  "Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional 'values of judicial

---

[10] In light of the court's analysis, it need not address defendants' arguments with respect to qualified immunity.

19

economy, convenience, fairness, and comity,' in deciding whether to exercise jurisdiction." Kolari v. N.Y.-Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006) (quoting Carnegie–Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988)); see also Artis v. D.C., 138 S. Ct. 594, 597–98 (2018) ("When district courts dismiss all claims independently qualifying for the exercise of federal jurisdiction, they ordinarily dismiss as well all related state claims.").

Here, judicial economy, convenience, fairness, and comity weigh in favor of declining jurisdiction.  While a significant amount of time has elapsed since this case was first filed, the court declines to exercise supplemental jurisdiction as trial is not imminent.  See Zito v. Fried, Frank, Harris, Shriver & Jacobson LLP, 869 F. Supp. 2d 378, 401 (S.D.N.Y. 2012) (quoting Purgess v. Sharrock, 33 F.3d 134, 138 (2d Cir. 1994) ("Under 28 U.S.C. 1367(a)(c), a Court has the discretion to exercise supplemental jurisdiction over pendent state law claims. If, however, 'the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.'").

## V.    CONCLUSION

For the foregoing reasons, defendants' Motion for Summary Judgment (Doc. No. 47) is granted.  The federal claims in Count One are dismissed with prejudice, and the remaining state law claims in Counts Three through Five are dismissed without prejudice.  The Clerk is directed to close the case.

**SO ORDERED.**

Dated at New Haven, Connecticut this 21st day of October 2022.


 /s/ Janet C. Hall
Janet C. Hall
United States District Judge